You may proceed. My name is Cynthia Timms. I represent Appellant Gospel for ASIA in this appeal. This appeal concerns an arbitration provision in agreements that the plaintiffs, who are Matthew and Jennifer Dickson, signed when they were becoming members of a religious order that's called Gospel for ASIA, or I'll call it GFA. Counsel, before you continue, could you bend that mic a little closer to you? I'm a little short. At the same time, they became members and an employee at approximately the same time. And then later, after leaving GFA, they filed this action, which has RICO allegations, fraud, deceptive trade practices, and unjust enrichment, arising out of allegations that GFA has misused some of the money that has been donated to it. The district court refused to stay or dismiss the case pending arbitration. And it held both that the arbitration agreement was not enforceable and that this action did not fall within the scope of the arbitration provision. So those are the two questions before the court today. Would we have to reach the second one if we agree with the district court on the first? No, I don't think so. If it's not enforceable, then I think that we're done. I think it's a bifurcated, you have to answer yes to both. I would like to touch on both subjects today. And first, I would like to start with enforceability. Enforceability is something that is subject to Texas law. Everybody agrees that Texas law applies to these contracts. And in Texas, there are two ways for an arbitration provision to be enforceable. First, if the arbitration provision itself is enforceable, if there are mutually binding agreements to arbitrate. Secondly, it can be part of an agreement in which there is sufficient consideration for that agreement. Well, counsel, where in the agreement is there any obligation taken on by gospel to submit itself to arbitration? It seems abundantly clear that the other side was taking on that obligation, but where is it clear that this was a mutual obligation to arbitrate? I'm glad you started there. That's where I wanted to start also. The arbitration provision itself says, and it says, the parties agree. And this is a quote, except I'm checking out an ING out of the word agreeing. The parties agree that the matter will be submitted to final and binding arbitration. That then raises the question, what are we talking about when we say the parties agree? But isn't it also meaningful what the matter is? Because it seems that when the person says, I agree that any and all disputes of any kind, the matter is going to be any disputes that they have with the entity, as opposed to disputes that the entity may have with the individual. Well, to me, the word matter gets almost into a scope question. Perhaps your honor is reading that a little bit differently than I do. But it's all disputes of any kind arising out of the relationship. And that's the scope of what is included in this arbitration provision. And so the matter must be something that's a dispute of any kind arising out of the relationship. And- Counsel, is it necessary, through the validity of this arbitration agreement, that it be reciprocal? Or couldn't there be some other consideration to support the agreement on the part of the plaintiffs in this case to submit their disputes to arbitration? Right. It's not necessary. I shouldn't ask a rhetorical question. Is it necessary for arbitration provisions to be reciprocal before there can be a binding agreement to arbitrate? That would be one manner only. But is it necessary? It is not necessary if we go down the other road. And the other road is that we have an agreement that is supported by sufficient consideration. I'm making the third suggestion, and that is that this promise by the plaintiff to settle disputes according to arbitration is matched with a promise by the defendants not to submit their disputes to arbitration, but to be bound by the arbitration in accordance with the rules and procedures set forth. In other words, it's not necessary that these clauses be reciprocal for there to be, outside the context of the whole contract itself, sufficient consideration to support the plaintiff's agreement to arbitrate. Do you see what I'm saying? Yes, I do see what you're saying. I think that's a third suggestion. The district court actually alluded to that fact in its opinion, saying the only consideration here might be that the defendant has agreed that the arbitration will be final and binding, but then it moved on as though to say, well, that's not enough, apparently thinking maybe that it was necessary that the promises be reciprocal before you had an enforceable agreement. But I don't see that. I agree with Your Honor. And furthermore, what that does is it sort of mixes the need for a consideration in certain circumstances with focusing on the arbitration provision. So it's entirely plausible that you would have an arbitration provision that's enforceable without mutuality if there is sufficient consideration for the arbitration provision. And we also have that throughout this entire agreement. I mean, you could have a promise to submit to arbitration, and the other party could promise to pay you $10, and that would be enough. It's nothing to do with the other party's duty to arbitrate. That is exactly right. So in addition to the parties, which is clearly defined as GFA and the Dixons agreeing to arbitrate, we do have the consideration, as you have pointed out. But then in addition to that, there are many forms of consideration in this document that are obvious from the face of the document. And one of the ones I've pointed out in the briefing is the fact that GFA is a religious order. And these folks, the Dixons, were joining a religious order. And that has certain tax consequences from the face of the document itself, because we're all charged with knowledge of the law, whether we actually know it or not. And the IRS has provisions that allow members of religious orders to not have to pay self-employment tax. It's an exemption. And you just fill out the forms, and you have that exemption. And so that is something that is obvious from the face of the agreement itself and that someone would know about. Is that a consideration from GFA, or is that just a consequence from the IRS as to how the taxes play out? Actually, on the forms that you fill out for the Internal Revenue Service, there has to be some form of documentation. GFA did have to send a letter in to the IRS, provide a letter, in order for the Dixons to claim that discount. And you're saying that that obligation is implicit in the Statement of Agreement? Yes, I am. But it's not, you're not saying it's in it? It's not spelled out. You will have these benefits, but it is implicit. I would also like to talk about scope for just a second. The arbitration agreement says it will, the parties will resolve, as I was talking about before, all disputes of any kind arising out of the relationship between the parties. Everybody agrees this is a very broad arbitration provision. But let's focus on what the relationship is. As members of the GFA order, the Dixons had to support, and then I'm going to quote from the agreement, by prayer and finances, the national ministries of the Gospel of Asia and Christ. They also agreed in another place to diligently work at raising financial support. Counsel, does that mean that if, while they're in that relationship, they discover certain activities are illegal, that somehow they are bound to not be able to disclose that to the government or seek redress for wrongs that they observe while a part of this entity? No, I don't think so at all. No one is telling them they can't bring an action against GFA. We're only talking about the forum. And so, but as members, they gave money, and their claims go back to 2007, when they were employees there. This is, they propose this as a class action, correct? So not all of the, if I understand, not all of the proposed members are, of the class, are members of the religious organization, correct? Right. So the claims must have some connection to a relationship of just payment, independent of the relationship as a member of the organization. The claims, and there is an ongoing, what happened is after this case was stayed, another set of plaintiffs called the Murphys filed an action, and that one is proceeding in federal court. Because that class does not include former members and employees. But, and I don't know if that answers your question, but this group would just be for the employees and folks who, members who signed this particular agreement. I'm going to save the rest of my time for rebuttal. Thank you, Ms. Timms. Mr. Stanley? Good morning, Maine Police Court. Thank you for the honor of arguing in this beautiful courtroom, in this beautiful courthouse. I'm Mark Stanley. I'm one of the lawyers for the putative class and the Dixons, along with Mr. Woodward, who's sitting with me. I'd like to start off by, you know, AT&T bundles all of your services. In this case, the defendants are all bundled into GFA, and I want to first unbundle the defendants. And that is, and Ms. Timms mentioned that the parties are clearly defined, in her view, as GFA and the Dixons. There is no evidence before this court whatsoever that KP Yohannan, Gisela Punoz, Daniel Punoz, David Carroll, or Pat Emmerich signed any type of arbitration agreement whatsoever. There's no, there's nothing in the record whatsoever that binds them to arbitration. So no matter what happens today, there's no way that those folks can be held, that we can be compelled to arbitration with them. Judge Holmes found that the only thing that they say in the record is a declaration of David Carroll that says that those folks are committed to reconciliation and arbitration. Hang on, let me find the exact words. I'm sorry. Are the appellants contending that? I'm sorry? Are the appellants contending that those individuals are bound by an arbitration agreement they did not sign? It's funny because it's bundled. They just say GFA and the defendants. But yes, they are at some level saying that these defendants are entitled to arbitration. They're here saying that to this court. They've never conceded that there's no arbitration agreement. The only thing that's in the record at all is a statement from Mr. Carroll that says, as a general matter, members of GFA agree to biblical reconciliation and arbitration, and that these defendants, he lists their names, and myself, are committed to biblical dispute resolution and arbitration. There are no similar agreements to the agreements that the Dixon signed by GFA or by any of the other individual defendants. And I just think that was an important point to start off with, that GFA and these defendants are separate. Judge Holmes found that, and it's really hasn't been addressed by GFA and the defendants very well. It's just nothing in the record. So I just want to make that clear. I guess I can go on to the consideration issues. And I want to address a little bit of what Judge Arnold said before, where maybe there was a third way of looking at it that Judge Holmes may have short skirted. I don't think so. I think what Judge Holmes said is, even if you liberally say that they're a party and that they agree that the matter will be submitted to final and binding arbitration in accordance with the rules and procedures set forth in the Unified Arbitration Act, he said that's pretty much invalidated by the next sentence. Accordingly, I, and that means Jenna Dixon, who was not even an employee, or Matthew Dixon, I knowingly and willingly waive any and all rights to initiate any action before any administrative agency or court of law or equity. And I think what, when I was young, my brothers used to play a game with me, I wasn't very smart, a coin flip, and it was called heads I win, tails you lose. And in this case, it's a heads I win, tails you lose. What they're saying is that the Dixons have to waive their right to go to court or an administrative agency and have to go to arbitration. But GFA, if the Dixons filed an arbitration, GFA would be bound by that. But GFA could sue the Dixons in court or go to an administrative agency, I don't know whether that'd be proper, but they could go to court and sue the Dixons. It was heads I win, tails you lose, as to GFA. And I think that's what Judge Holmes was saying, is there's no mutuality of obligation to make arbitration the sole remedy or the sole forum to adjudicate this dispute. It doesn't have to be. It doesn't have to be. Arbitration don't have to be reciprocal. Okay. I hear what you're saying there. I'm not sure. I think that the fact that the Dixons had to go to arbitration, couldn't go to court, and GFA could choose their forum, I believe invalidates it. But I hear what you're saying. I would also say- I mean, I could agree with you that I will submit my claims against you to arbitration and to support that promise. You could promise to pay me $10. There's no reciprocal obligation for you to submit your disputes. Well, I think we could also tear this apart a little more. GFA certainly didn't sign this. There's no one from GFA that signed this. GFA, you know, when you and I agree to that and there's a $10 payment, you and I are actually entering into that agreement. This is a total unilateral statement on behalf of the parties because there's no indication that GFA ever assented to your $10 deal. Well, I don't want to press you on this, but it does say the parties. It says the word the parties, but still- The other person be. So if I sign a document that says I and Judge Arnold agree to arbitration, the parties, being Judge Arnold and I, agree to arbitration and I agree to pay him $10 and I sign it Mark Stanley and you didn't, where have you agreed to arbitration? You haven't. There's nothing indicating that GFA ever assented to it. I think there has to be. Suppose nobody signed it. Couldn't there be evidence as to who the parties were that could be introduced? I don't know. Is a signature necessary for- Well, there's nothing in the record here showing that GFA did it. And then if you look at the rest of the agreement, there's nothing in there that shows that GFA agreed to any other duty towards the Dixons. There's no consideration for it. What about the training? I know that comes in a little different from the- You know, the training is, so let me ask you, is there anything in the agreement, could the Dixons sue GFA for no training? Is there really a promise of training in there? Training's not defined. We don't know what training is. It's not defined whatsoever. There's no promise of training in here. It says after the agreement of training. And by the way, Matt Dixon was the employee, not Jenna Dixon. I have no idea what training they're talking about with Jenna Dixon. She was his spouse, but she didn't work for GFA. She didn't get money from GFA. There's no indication what this training is. It says a minimum of two years following the successful completion of my training and probationary period, neither of which are defined. It doesn't say who's providing the training. And again, I'll say this, if Jennifer Dixon said, wait a second, you promised me training under this agreement. They would say, what are you talking about? Where did we promise you any type of training in this agreement? It's simply not there. There's no consideration for training. There's no consideration for this tax break. It doesn't say anything in here. That's totally outside of this contract. If you look at the contract of this one-sided agreement, if you look at these pages, there's nothing in this statement of agreement that says that the Dixons will benefit from the tax treatment with the assistance of GFA. That was something that they made up. Yes, ma'am. What is the difference between the statement of agreement for Matthew as an employee and the statement of agreement for Jennifer as I guess I'll call a member? So there really aren't any significant differences. There were two statements of agreement for Matthew. The first one, I tried to figure out what the differences were. In the first one, he agreed he wouldn't see R or X rated movies. In the second one, two years later, it said, oh, movies that couldn't have ungodly content. That was the change in those. But between the second one that he signed and the first one that Jenna signed, there is no difference. And maybe I'm overlooking something obvious. I'm not sure I'm understanding the difference between an employment contract and a member agreement or an employment agreement and a member agreement because I didn't see anything employment-like. I'm as befuddled as you are. I don't see the difference either. And my whole point on that is if it's a member agreement or an employment agreement, I, as a non-church member, I would say training. I would assume what meant training as an employee or training. I don't know what it means, but I don't know what the training is. I'm certain that the Dixons couldn't sue GFA for any promise here because there is no promise in this agreement that GFA made as to training. I wanted to turn to scope for a moment if I can. The cases that we cited, particularly the Jones case in the Fifth Circuit, say what the court has to do is look at the complaint, not at the titles of the complaint. I agree with Ms. Timms that this is a broad interpretation of a broad arbitration agreement because it has to relate to and everything like that. But even broad agreements have their limits. In the Jones case, she was a contractor for Halliburton. And she said, any matters related to my employment shall be arbitrated. In fact, she was sexually assaulted while she was in Iraq. And they said, no, that's not going to be the case. We look at what is in the agreement, your employment agreement, what was the subject matter. And then we look at what you're alleging. In this case, we allege in a preliminary statement and in the complaint, but this preliminary statement sums up pretty well. Soliciting charitable donations to benefit the poorest of the poor while covertly diverting the money to a multi-million dollar personal empire is reprehensible. Using a Christian organization as a front to attract and exploit the goodwill and generosity of devout Christians is a particularly vile scheme. And that's exactly what KP O'Hanlon and the other defendants did. They've been getting away with this for years. They put hundreds of millions of dollars in private equity markets. They bought a for-profit hospital. They bought a for-profit education center, a soccer team, a rubber plantation, and they speculated hundreds of millions of dollars in Hong Kong in financial markets. Now they say, Ms. Tim says, that in the agreement, the plaintiffs agree to financially support by prayer, to support by prayer and finances, the national ministries of the gospel of Jesus Christ in Asia. That's the point. This is like the Jones case versus Halliburton, the sexual assault case. That's not what happened here. They took the money. We're suing for RICO, for fraud, for misrepresentation. They took our money, which we were giving, by the way, since 2004 to 2014, before this agreement was signed. And after this agreement was signed, we were making donations. Our accounts were making donations. They took this money and they diverted it, not for the national ministries of gospel of Jesus Christ in Asia, but rather to buy property in KP O'Hanlon's name, in India, a hospital system in his name, this private education system, media empire, a soccer team, hundreds of millions of dollars, personal residences, palatial offices. They built all this stuff in his name. That is outside of anything possibly contemplated in this statement of agreement. Does the arbitration agreement have anything about who would choose an arbitrator or what arbitrators would be qualified, other than that they would use? The so-called arbitration agreement does not. They put a name called the Unified Arbitration Act. Judge Holmes said it probably meant the Uniform Arbitration Act, probably Scrivener's effort. But no, there's nothing about where the arbitration be held, who would do the arbitration, what the rules would be under. And again, I'll say there was no consideration. It wasn't signed by anyone on behalf of GFA. It's no different than me deciding, that Judge Arnold and I, I'll pay him $10 and we'll go to arbitration. If he doesn't do anything that agrees to it, just because I say it's the parties, is not meaningful. It has to be a bilateral. There's no mutuality of obligation. We could go, we're supposed to be stuck with arbitration, but they get a get-out-of-district-court-free card. They can choose to file in the district court, I'm sorry, if they want. And we can't. I think that's really the main, the salient points were, that the obligations, the arguments that we make, and the law in the Fifth Circuit, the Ford versus New York life care health plans, similar case. Ford was a doctor. He entered into an orthopedic contract with an HMO, but he sued over false advertising to the Lanham Act. The court, the Fifth Circuit, analyzing Texas law, which is what we're doing here, the Eighth Circuit analyzing Texas law too, looks at this and says, the test focuses on the factual allegations of the complaint. The fact that an agreement exists between Dr. Ford and the HMOs is legally irrelevant, and indeed can be treated as non-existent as far as false advertising complaint is concerned. That's very analogous to here. Here we're saying, yes, we donated to support the missionary criteria and goals of the ministries in Asia. That's not what happened. You called an audible. You took our money. You put it into your pockets. You put it into this hospital system. You bought a soccer team in Myanmar, which I can't figure that one out. You bought a rubber plantation. Is there anything in the agreement, there's something about to support by prayer and finances. That's what the members are to do. Is there something in the agreement then that would obligate the GFA on how to use the money such that this might then fall within the scope of the arbitration provision? There is nothing in the agreement that obligates GFA to do anything because it's a unilateral agreement. There are no promises from GFA whatsoever in this agreement. It's totally unilateral. But I will say again, even being generous to that point where it says, and I'm going to go back to this point, to support by prayer. This is under the mission statement. Gospel of Asia exists for the following purposes to support by prayer and finances, the national ministries of the gospel of Jesus Christ in Asia, taking the money outside, spending it, putting it in your pocket, building palatial homes, buying a hospital system that's a for-profit, a media empire, a soccer team, a rubber plantation, and literally hundreds of millions of dollars in the Bank of Hong Kong, which has nothing to do with India or for the national ministries. Counselor, your time's expired. Thank you so much. Thank you, Mr. Stam. Ms. Thames, your rebuttal. Thank you. May it please the court. Let me start with the last point that's being made. This is, let me point out first, the entirety of the mission statement sets out what gospel of Asia exists for, and it exists to help evangelize, to build up Asian believers, and it names a number of things. But the argument that you just heard is, it's a backwards reasoning argument. It is, let's first see how bad this is, and then let's reason backwards as to what the forum should be, as to where it is that you make the decision as to liability or lack of liability and how much damages might be owed. And so the whole of this, and in fact, the question was asked about employment versus missionary work. What you see in this document is that this is a religious order. They are bringing people in as missionaries. That's why it reads in a different manner than our contracts do of businesses exchanging goods and services. It is a mission statement because these are missionaries. This is what their purpose in life is going to be. That's what the organization says. Then what makes one of these agreements of an employment agreement and one a membership agreement? No, they all read the same. I think they just start off and they have the title agreement. It is simply that with Matthew Dixon, he was also an employee. He was an IT employee. The training, I believe, was more of a religious type of training. He already had the IT. So his employment is through another contract or another provision is not relevant here? This one agreement covered everything with respect to Matthew Dixon. He did not have a separate employment agreement. They were required, however, as an employee, part of the mission was that they were required to try to fundraise enough funds to help cover his salary. But he was paid a self-employment salary through GFA. But that was the purpose for all of that. Let me just touch on a couple of things here. These contracts, as they stand before this court today, they're not the incipient stages of these contracts. They are fully executed. The Dixons left GFA five years ago. And so to go back and argue that they're illusory or that they lack consideration when they have been fully performed is an argument that Texas has rejected in other similar situations. Also, it is correct. Texas does not require a signature on these kinds of contracts. And then finally, as for the type of arbitration that would be had, the judge, the district judge, and I think all the parties agreed that there was a typo. It's the Uniform Arbitration Act that the agreement cite to. I printed that out last night. Was there any evidence produced to indicate that? There was no dispute as to it, that that was simply a scrivener's error and that basically the parties had adopted that Uniform Arbitration Act with all of its many, many provisions that set out how parties would arbitrate. I thank the court. And we ask that the court enforce the arbitration agreement. Thank you. Thank you, Ms. Timms. Thank you also, Mr. Stanley. Court appreciates counsel's presence and argument that you've provided to the court. The briefing which you've submitted will take the case under advisement and render decision in due course. Thank you.